HAISH (WASHBURN & M. MANUF'G CO. v.). See Case No. 17,217.

HAIZLETTE v. LAKE. See Case No. 3,253.

HALBERSTADT (UNITED STATES v.). See Cases Nos. 15,276–15,278.

HALCYON, The (ACOSTA v.). See Cases Nos. 31 and 32.

---

## Case No. 5,907.

HALDERMAN et al. v. BECKWITH et al.

[4 McLean, 286.] [1]

Circuit Court, D. Ohio.　July Term, 1847.

NAVIGATION OF RIVERS — COLLISION BETWEEN STEAMBOATS — DAMAGES — APPORTIONMENT — REGULATION OF COMMERCE.

1. The general usage of a river, in regard to the navigation of ascending and descending boats, and which, from long experience. has been established as a precautionary measure, should be followed by pilots and others.
[See Barrett v. Williamson, Case No. 1,051.]

2. A descending boat, when apprehensive of a collision, will stop her engine, and float, leaving the ascending boat to choose the best mode of avoiding a contact.

3. If the plaintiff is in fault, he can not recover damages; nor where both parties are in fault, by the common law.
[Cited in Wright v. Brown, 4 Ind. 98.]

4. The maritime rule apportions the damages as the faults of the respective boats may be established.

5. A state has no power to regulate a commerce which extends beyond its jurisdiction.
[Cited in Sherlock v. Alling. 44 Ind. 195; Com. v. Philadelphia & R. Ry. Co., 62 Pa. 290.]

6. Where a commerce begins and terminates within a state, it has the exclusive commercial power over it

7. The Louisiana law, which adopts many regulations in regard to the navigation of the Mississippi, can not affect boats engaged in carrying on commerce between the state of Louisiana and other states. Such a power exercised by the states, would be destructive to a general commercial intercourse.

8. What damages may be recovered from an offending boat?

In admiralty.

---

[1] [Reported by Hon. John McLean, Circuit Justice.]

Fox & Lincoln, for plaintiffs.
Walker, Kebler & Taylor, for defendants.

OPINION OF THE COURT. This action is brought by the plaintiffs, to recover damages for an injury done to the Yorktown, the plaintiff's boat, by the Talma, the boat of the defendants. The collision took place at the Dead Man's Bar shute, on the Mississippi river, the 16th of March, 1845. The Yorktown was descending the river, and the Talma ascending it. Coleman Stewart was pilot on the Yorktown, and between one and two o'clock at night was descending the Dead Man's Bar shute, about two hundred yards from the Louisiana shore. When he first saw the Talma, she was ascending the river near the opposite shore. The Yorktown was descending the river in the usual channel for descending boats. The Talma changed her course, and ran across the river until she struck the Yorktown almost at a right angle, or nearly so, and cut a hole through her hull as large as a flour barrel. The Yorktown was running parallel with the shore. William B. Dodson was mate of the Yorktown, and was on her hurricane deck nearly over the place where the Talma struck her. When he first saw the Talma, she was running up the river. The Yorktown was nearly parallel to the shore, on the opposite side. The Talma turned nearly across the river. The distance between the boats would have been eighty yards, had not the Talma changed her course. It was a starlight night. Witness could see the shore distinctly. A descending boat could be seen from three-quarters to a mile. When the danger became apparent, nothing could be done to avert the collision. James E. Workman was a passenger on board the Yorktown, and was on the boiler deck when the collision occurred. The Yorktown pointed down the river; the Talma appeared to run across it. The Yorktown was from two hundred and fifty to three hundred yards from the shore. The witness took particular notice of the position of the boats, by the request of the captain of the Yorktown. The Talma backed out. The witness could see the shore distinctly. He heard Captain Sturgeon, of the Talma, say, if Walpole had been at the wheel, the accident would not have occurred. John Hickman was a passenger on the Yorktown, and was on the starboard guard when the collision took place. The Talma was about fifty yards from the Yorktown when witness first went out. Witness was formerly a pilot. The boats were about three hundred yards from the shore when the contact took place. He could see the shore distinctly. Henry Pierce was a passenger on the Yorktown. The Talma struck the Yorktown from two hundred and fifty to three hundred yards from the shore. He could see a boat on a straight part of the river two or three miles. Jacob Beber was a passenger on board the York-

town, and was on her larboard guard when the collision took place. The Talma struck her on the starboard side. The Yorktown was running down the river, two hundred or two hundred and fifty yards from the shore. The Talma turned across the river and struck the Yorktown. James W. Venience was a passenger; the Yorktown was running down the river; the Talma turned across it, appearing to have a full press of steam, until she struck the Yorktown. William F. Davis was a passenger on the Talma, and was, at the time of the collision, sitting on the boiler deck, over the hatchway wheel; saw the descending boat before the contact. It was a clear night; the Talma was running up under full way; she headed across the river, and the witness saw that a collision was inevitable. After the Talma struck the Yorktown, the engine went ahead, one-fourth or half a minute. James Bell was engineer of the Yorktown, and was on watch. Both engines of the Yorktown were stopped, and he coupled up the engines for backing. Saw the Talma coming out square from the shore. The Yorktown was two hundred and fifty or three hundred yards from the shore. Everything was done, that could be done, to avoid the collision by the Yorktown.

The above statements are fully corroborated by nine other witnesses. And fifty-six witnesses were examined, being pilots, many of them having great experience and being well acquainted with the navigation of the river, and especially at the shute where the collision took place; and they all say that at the stage of water then in the river, the Yorktown was in her proper track; and the track of the Talma, as an ascending boat, was near the shore. And they all concur in saying, that the usage of the river is for the descending boat to keep on her way, and the ascending boat was bound to do the dodging, or avoid a collision with the descending boat. That when the peril becomes great, the descending boat should stop her engine, so as to slacken her speed, and make the duty of the ascending boat easier to avoid a collision. On such occasions the big bell is usually rung. In behalf of the defendants, many witnesses were examined, but they were less numerous than those of the plaintiffs. William Pennington, who was pilot of the Talma, says, when the Talma entered the shute, she ran as near the shore as was safe. When he first saw the Yorktown, she was within one-fourth of a mile of the Talma. As soon as the Yorktown hove in sight, the mate said that boat was running on them. He stopped the engine, directed it to back, and the Talma was going back when the collision occurred. Thomas Miller was on board of the Talma, and a watchman called his attention to the Yorktown, which was from three to six hundred yards distant. The Talma was as near the shore as safety would permit. The stern of the boat was very near the shore. Her engine commenced backing before the collision.

William O. Irvin was assistant mate on the Talma. When the collision took place, the bells of the Talma were ringing violently. The stern of the boat was so near the shore, as to prevent the lowering of the yawl. Michael Rogers was assistant engineer on the Talma. He was in his berth when the collision took place. Ran out on the starboard side over the boiler deck. The boats had been separated ten or twelve yards. The stern of the Talma was near the shore. James Mann was second engineer on the Talma. The boat was too near the shore for the Yorktown to run between her and the shore. Before the collision, the larboard engine had made three revolutions backward, and the other engine one. The force of the Talma was nearly exhausted when the boats came together. Charles M. Corrie was mate on the Talma, and was on his watch when the collision took place. When he first saw the Yorktown, she was from three to five hundred yards distant. She seemed to be coming on the Talma. Witness ordered the bell to ring, then to back hard. The Yorktown ran down the stream, turned her bow from the shore, which threw the stern of the boat round, so as to strike the Talma. The Talma was so near the shore that it was not safe to let down the yawl. No mistakes made by Pennington, within the knowledge of the witness, as to ringing the bell. Eleven other witnesses were examined, who corroborated many of the facts stated by the above witnesses. And twenty-three pilots were sworn, who agree in saying, that the proper place for the Talma as an ascending boat, was from thirty to fifty yards off the shore. In this, there is a concurrence of all the pilots. And the witnesses all agree that it was a star-light night.

The court have been requested, gentlemen of the jury, to state their views of the law on several points. And first, the court charge you, that if the collision was a misfortune, without the negligence of either party, the plaintiff can not recover. There can be no wrong in such a case, which the law will redress, where the persons navigating the respective boats, possessed the proper skill and experience and were chargeable with no negligence, and had no intention to do wrong. This is the common law rule, not the maritime. And the court will also charge you, that if the collision resulted from the negligence of the plaintiffs, they can not recover. In this respect also, the rule of the common law is different from that of the maritime law. Under the latter, if both parties have been negligent, but one of them in a greater degree than the other, the loss will be apportioned accordingly. But by the common law, a party who asks damages for a wrong done, must fix the wrong on his adversary. If the parties are both chargeable with negligence, more or less, a court of law will not balance the negligence, to ascertain whether on the one side it was not greater than on the other.

If the collision occurred from the negligence or design of the defendants, and the plaintiffs acted with ordinary caution, they are entitled to recover. Whether negligence on the part of the offending boat, was the result of ignorance or design, it is equally liable. If, indeed, there was an intention proved, by the officers of the Talma to run into the Yorktown, that, I suppose, would establish their liability, without much inquiry into the conduct of the other party. On this point, the language of Chief Justice Tindal is: "If the plaintiff contributed in any degree by any want of care or improper conduct to the injury he can not recover." This does not mean that the plaintiff must be entirely faultless. Raisin v. Mitchell, 38 E. C. L. 358. Tindal, Chief Justice, to the jury: "You must be satisfied that the injury was occasioned by the want of care, or the improper conduct of the defendants; and was not imputable, in any degree, to any want of care, or any improper conduct on the part of plaintiffs." Five hundred pounds claimed—jury found two hundred and fifty pounds. Some mistake was alleged. Tindal asked the jury how they had made up their verdict. The foreman answered, that there were faults on both sides. Tindal: "Then you have considered the whole matter?" The foreman replied in the affirmative. Richards then submitted that the verdict should have been for the defendant. Tindal said: "No. There may be faults to a certain extent." It might appear that the plaintiff, possibly, could have acted more judiciously than he did to avoid the collision after the event has occurred. There is a great difference between the view at the moment of danger, under excitement, and after the event, on looking calmly at the facts. And the law adapts itself to the exigencies of the moment, making some allowance for the infirmity of human judgment—not the infirmity resulting from ignorance, or a nervous excitability, which unfits a man for such an emergency. This is one of the most important qualifications of a pilot. He must stand firmly at the helm, and look on the danger, however imminent, as the best mode of avoiding it. The highest possible degree of skill is therefore not required in a case like the present, for that is possessed by very few individuals, engaged even in the most hazardous enterprises. But there must be caution and skill, such as every one would be expected to exercise, who takes upon himself the pilotage of a steam vessel.

The attention of the court is called to the Louisiana law, which regulates the navigation of steamboats. This law contains numerous provisions in regard to the inspection of boilers by competent persons, hanging out lights, ringing the bells, stopping the engines and floating, by the downward boat, when within a certain distance of the ascending boat, etc. As a matter of fact, it is known that this law was before congress, and especially the committee of the house of representatives who reported the bill to regulate the navigation of steamboats, and it appears on an inspection of both laws, that parts of the Louisiana act were incorporated into the act of congress. Such parts, were, no doubt, adopted as congress deemed judicious, having the subject fully before it. And we are asked to charge the jury that the Louisiana law is binding on the parties before us, and that unless the plaintiffs complied with its requirements, they can not recover. There can be no doubt that Louisiana has the power to regulate commerce within her limits, where the trip begins and terminates within her jurisdiction. But the voyage of the Yorktown, at the time the collision happened, was from Cincinnati to New Orleans, and the question arises whether the Louisiana law regulates the duties of the officers of the Yorktown under such circumstances. It is admitted that the Talma, having left New Orleans, was proceeding to Louisville, in Kentucky. The vital importance of this question to Western navigation, entitles it to a serious examination. We are aware that there are some minds, who have so long and ardently cherished a jealousy of federal powers, that they deny the existence of such powers when they stand in the way of state authority. They seem to think that our Union is safe only, and the rights of every citizen best secured, by recognizing all power in the states except, not those that have been delegated to the federal government, but those which the states, respectively, shall determine belong to it. This would throw us back on the articles of confederation, an escape from which, by the adoption of the constitution, saved the Union from ruin.

In the 8th section of the 1st article of the constitution, it is declared that congress shall have power "to regulate commerce with foreign nations, and among the several states, and with the Indian tribes." This power is found in a class of powers conferred by the constitution, every one of which, in its nature and character, is exclusively vested in the federal government. Two of them, it has been held, may be exercised by a state, until congress shall act on the subject; and the other, it has been decided, may be carried out by a state, in disregard of the action of congress. The two first include the power to pass a bankrupt law, and to regulate commerce. The other is the power to punish for counterfeiting, or passing the coin of the United States. The first two are impracticable, as they involve the absurdity of two distinct powers regulating the same thing. This is only obviated by the admission, that the action of congress necessarily supersedes state action. But this is wholly indefensible. And it is disparaging to state power to say, that any part of it may be abrogated by the action of congress. It is not the regulation of the subject by congress which is to annul state action, but the very thing must be regulated by the former, which the latter has

acted on; as, for instance, the hanging a light out, at night, on the deck of a steamboat. In other words, that the law of congress and the law of a state regulating commerce must be compared and considered, as having been passed by the same power, and if they are not identical, the state regulation stands. In this view. congress, however much they may have considered a regulation similar to the one adopted by the state, can only get rid of it by expressly nullifying it. And when such a game shall commence, we are not wanting in experience to know, that a state, being a smaller body than the Union, will outstrip it. The other power, to punish for counterfeiting the coin, involves the inconsistency and inconvenience of punishing a counterfeiter twice for the same offense. It is clear that a punishment under a state law for such an offense could not be pleaded in bar to a prosecution under the act of congress. It would be a singular anomaly in any government, having the power to coin money and regulate the value thereof, if it should look to a distinct government for the protection of this right.

It will be observed that the power to regulate commerce among the several states, is given in the same clause of the constitution, and in the same language, as the power to regulate commerce among foreign nations. And the power may be exercised to the same extent, with the few exceptions contained in the constitution. As the power is "to regulate commerce among the states," no regulation can be made by congress but such as shall embrace two or more states. The constitution, therefore, did not intend to interfere with a commerce which was limited to a state. But the commerce carried on by both the boats in question, was one among several states, and was, in no sense, limited to the state of Louisiana. In a voyage from Pittsburgh to New Orleans, a steamboat passes within the jurisdiction of ten states, each one having the same power as Louisiana to regulate the commerce which passes through it, or is destined to any of its ports. Concert of action among so many states is not to be expected. Each state following its own notions, in regard to commerce, may make such regulations as it shall deem proper, regarding only its own interests. Collisions, in the nature of things, would arise between different states, as they did under the confederation, and the commerce of the country would be destroyed. Here are ten different regulations, and how is the steamboat conductor to ascertain when he passes out of one jurisdiction into another? The jurisdiction of each state extends to the middle of the river, and how is a pilot to know, in descending or ascending, to which shore he is the nearest? A stroke of the wheel takes him from one jurisdiction to another. Could any one imagine a system more impracticable than this? If any one were to devise a means for the destruction of commerce, nothing would

better secure such an object than this system. Even the steamboat captains are better constitutional lawyers, I fear, than some of our jurists, as they say uniformly, on being asked the question, that they disregarded the Louisiana law, believing the state had no power to pass it. And, gentlemen of the jury, they have no such power. As before remarked, the law is operative on a commerce that is wholly within the state. But over a vessel which is pursuing a trip from Cincinnati, or Louisville, or Pittsburgh, or any other place out of the state of Louisiana, the law has no operation. And you will regard it as having nothing to do in the regulation of either of the boats in question.

There is a good deal of conflicting testimony in this case, more I think, than I have ever witnessed in any case. You are the exclusive judges of the credibility of witnesses. The facts admitted by all the witnesses may aid you in coming to a satisfactory conclusion. It appears the Yorktown was run into, which could not have been done, if her stern, as one of the witnesses said, was thrown round so as to strike the Talma. Serious injury was done to the Yorktown by the collision, and it would seem, could only have been done by the Talma striking her in the manner stated by a majority of the witnesses. Some allowance should be made for the conflicting statements of witnesses, from the deceptive water view at night, especially in regard to distances. But the remark is made with regret, that this cause can not satisfactorily account for the conflict in some of the statements.

The following instructions were asked in form and exceptions as noted, were taken. And thereupon the plaintiffs claimed the following items of damage of which they offered proof: 1st. For the expenses and delay of the Yorktown at the place of collision, and at New Orleans, her port of destination. 2d. For the expense and delay of taking said Yorktown to Cincinnati, which, it was admitted by the parties to be the most suitable port for making the repairs. 3d. For loss of time in the use of said boat while she was undergoing said repairs. which was proved to be two months. 4th. For the cost of said repairs, which were proved to be ($3,025 07) three thousand and twenty-five dollars and seven cents. 5th. For the diminished value of said boat after she was repaired, from loss of reputation or otherwise. 6th. For interest upon all the items from the time said boat was repaired. And thereupon, the defendants produced a statute of the state of Louisiana, entitled "An act relative to steam boats," passed March 6th, 1834 [Laws La. p. 55], a copy of which is hereto annexed, marked A, and made part thereof, by the tenth section of which it is provided as follows: "That it shall be the duty of the master and pilot of a steam boat. when descending any river or stream, in the night. within the limits of this state, when within one mile of an ascending

boat, to shut off the steam and ring the bell, and permit the boat to float upon the current of the river until the ascending boat shall have passed, and the master and owner of the ascending boat shall then assume the responsibility of steering clear of the descending boat and be liable in damages to the extent of the injury which shall be sustained."

And thereupon, the defendants requested the court to charge the jury that this act governed the case, and was a bar to any recovery by the plaintiffs; which charge the court refused to give, but did charge that the act was void as a law, for want of power in the legislature of Louisiana to pass the same, except as to boats exclusively navigating waters within the state of Louisiana, but might be received by the jury as a fact going to show what the said legislature regarded as prudent navigation. The defendants also gave in evidence tending to show that the Talma was coming up the river in her right place, near the Louisiana shore, and rang her big engine bell and stopped her engine and commenced backing as soon as a collision was apprehended by her officers, and was in the act of backing when the collision took place, which was somewhere within three hundred yards of the Louisiana shore, the river being about one mile wide at that place, and adduced the evidence of twenty-five pilots to show that the most prudent and usual course of navigation for the descending boat in the night season, even at the high stage of water which then existed, would have been to descend in the main channel of the river, which at that place was near the Mississippi shore, and more than half a mile from the place of collision, and if there were danger of collision to ring the alarm bell and stop her engines and float, and back her engines when danger became imminent, which course is pursued by many pilots, though not by a majority; the plaintiffs having previously introduced evidence of fifty-five pilots navigating said river, to show that it was the most usual course of navigation at the place of the collision, for descending boats to navigate between one hundred and fifty and three hundred yards from the Louisiana shore, and the ascending boat to navigate from twenty to fifty yards from the Louisiana shore.

And thereupon the counsel for the defendants requested the court further to charge the jury as follows: 1. In order to recover in this case, the plaintiffs must satisfy you that the collision was caused wholly by the fault of the defendants, and that no fault of the plaintiffs contributed thereto. 2. That if it was a case of mere misfortune, or of mixed fault, or of inscrutable fault, the plaintiffs can not recover. 3. The issue to be tried, is negligence or not; and if the negligence of the plaintiffs contributed to the collision, they can not recover. 4. No usage of navigation can sanction a departure from the rules of prudence and safety. 5. The rule of damages, if plaintiffs recover, is the cost of repairs, and the expense of bringing the boat to the place of repairing. The second, third and fourth of which instructions were given as requested; but the court refused to give the first charge, and refused to give the fifth charge in the language asked, and charged the jury as follows, in lieu of the first charge asked: That if the plaintiffs were making use of ordinary care and caution, and running according to the most usual course of navigation at that place, although such course might not be the most prudent and safe, in the opinions of some individuals, nor the course pursued by many pilots less than a majority, this was sufficient to entitle them to a verdict, if the jury believed the collision was occasioned by the fault, negligence, or unskillfulness of the defendants' officers navigating the Talma. That no usage could be respected in a court of justice, which was not founded on prudential considerations, and such as tended to the safety of navigation. But extreme caution was not required. The plaintiffs must show that they were descending the river in the ordinary course of descending boats, and that they exercised ordinary prudence and skill, under the circumstances, to avoid the collision. That if the Talma took a shear across the river, running her bow square into the Yorktown as she was descending the river, and it was not in the power of the helmsman of the Talma to prevent such a shear, the facts should be proved in excuse.

And THE COURT charged, in lieu of the fifth instruction asked, that if the plaintiffs recovered at all, they were entitled to recover the five first items above mentioned, except so much of the fifth item as related to loss of reputation; and as to the sixth item—that of interest—the court refused to charge either way, and left it to the discretion of the jury. To all which refusals to charge, and charges given not according to the request of the defendants, the defendants excepted, and pray the court to sign and seal this their bill of exceptions, which is accordingly done, and ordered to be made a part of the record.

Verdict for the plaintiffs.

The judgment in the supreme court was affirmed by a divided court [case unreported]. The division was on the instruction in regard to the Louisiana law.